UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARLOS GORDON,

                    Plaintiff,

          v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

                    Defendants.

Case No.  20-cv-03910-JCS

**ORDER REGARDING MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 50

## I.     INTRODUCTION

Plaintiff Carlos Gordon brings claims under 42 U.S.C. § 1983 against Defendants the City and County of San Francisco (the "City") and officers Vincent Pacchetti and Tyler Dove of the San Francisco Police Department.  Defendants move for summary judgment on all claims.  The Court held a hearing on November 19, 2021.  For the reasons discussed below, Defendants' motion is GRANTED.[1]

## II.    BACKGROUND

### A.     Facts at Issue

This section is provided for the convenience of the reader and is not intended as a complete summary of the evidentiary record.  Because evidence is construed in favor of the non-moving party on summary judgment, this order generally presents the facts at issue in a light favorable to Gordon.  Nothing in this section should be construed as resolving any disputed issue of fact.

On November 17, 2018, San Francisco Police Lieutenant Scott Heidohrn provided a pre-watch safety briefing at the Southern Station, in which he discussed an outstanding arrest warrant

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

1    for Gordon and warned officers that Gordon had a history of violence, including "a murder

2    conviction" and violently resisting arrest.  Heidohrn Decl. (dkt. 50-14) ¶¶ 2–4.  The warrant was a

3    bench warrant for failure to appear at an arraignment issued on June 27, 2018 by the California

4    Superior Court for the County San Francisco.  Defs.' Request for Judicial Notice ("RJN," dkt. 51)

5    Ex. A.  Defendant Dove was present for Heidohrn's briefing and was already familiar with

6    Gordon from a 2015 attempted murder case.  Rollan Decl. (dkt. 50-1) Ex. C (Dove Dep.) at 8:1–

7    9:22.  Defendant Pacchetti was also familiar with Gordon based on his own past experience with

8    him, talking to Lieutenant Heidohrn, and talking to his then-partner Dorn.  Goff Dep. (dkt. 58-1)

9    Ex. C (Pacchetti Dep.) at 7:13–20.  Gordon had previously pled guilty to manslaughter in 2008,

10   which was presumably the purported "murder conviction" referenced in Heidohrn's declaration.

11   *See* Rollan Decl. Ex. D (Gordon Dep.) at 10:20–24; *cf.* Heidohrn Decl. ¶ 4.

12        On November 19, 2018, Dove and Pacchetti saw Gordon violate a stay-away order, when

13   they spotted him outside the residence that was the subject of the order and he ran into the house.

14   Rollan Decl. Ex. C (Dove Dep.) at 9:23–10:5; Goff Dep. Ex. C (Pacchetti Dep.) at 38:8–16.  The

15   stay-away order had been issued in 2015 as part of a protective order arising from domestic

16   violence.  RJN Ex. B.  The officers did not enter the house to arrest him at that time.  Goff Dep.

17   Ex. C (Pacchetti Dep.) at 38:17–25.

18        On November 20, 2018, Gordon was standing on Market Street in San Francisco with a

19   female companion when Dove and Pacchetti approached in a marked patrol car.  Gordon Decl.

20   (dkt. 58-2) ¶¶ 2–3.  Gordon was not aware that he had pending court proceedings or that a warrant

21   had been issued for his arrest.  Rollan Decl. Ex. D (Gordon Dep). at 13:10–25.

22        As Dove and Pacchetti exited the car and approached Gordon, Pacchetti said, "What's

23   going on man, how are you?," and asked Gordon to remove his hands from his pocket.  Rollan

24   Decl. Ex. H (Pacchetti's body camera video) at 0:10–0:12.[2]  Gordon responded, "What?," and

25

26   [2] This order cites video evidence filed with Defendants' motion in minutes and seconds from the
     start of the video files submitted in evidence, not using the "Zulu time" timestamps that appear in
27   the videos.  The Court notes that Gordon's attorney also purported to file the body camera videos
     and the police report as attachments to his declaration, *see* Goff Decl. (dkt. 58-1) ¶¶ 2–3, 5, but
28   rather than actually file those materials, instead submitted a notice that, "if the Court requires,"
     they "will also be produced on a thumb drive and delivered to the Court," dkt. 59 ¶¶ 1–3.  Merely

United States District Court
Northern District of California

United States District Court
Northern District of California

1    when Pacchetti repeated his request, Gordon promptly removed his left hand from his pocket and

2    raised it away from his body to his side in questioning gesture. *Id.* at 0:12–0:15.  Gordon's right

3    hand, which was holding a cell phone, was never in his pocket during the events at issue. *See id.*

4    Pacchetti said again, "Just get your hands out of your pockets for me, that's all I'm asking right

5    now," and when Gordon dropped his hand back to his side (but not in his pocket), Pacchetti said:

6    "So, it's just like that.  Hey, listen.  Hey, listen, you're under arrest." *Id.* at 0:15–0:23.  As he was

7    speaking, Pacchetti reached for Gordon's arm, and Gordon pulled away, asking, "For what?" *Id.*

8    at 0:23–0:25.  Pacchetti repeated that Gordon was under arrest. *Id.*

9          At that point, Dove had approach from behind Gordon, and there was a short struggle, with

10   the officers reaching for Gordon's arms and Gordon continuing to pull away.  Although not

11   clearly visible in either officer's body camera recording,[3] the parties agree that Pacchetti punched

12   Gordon in the face at least once during the struggle. *See* Gordon Decl. ¶ 9.  Gordon turned

13   towards Dove, who testified that Gordon swung his arm at him and grazed him in the face.  Rollan

14   Decl. Ex. C (Dove Dep.) at 23:6–15, 24:15–21.  Viewing Dove's video footage in the light most

15   favorable to Gordon, a jury might conclude that Dove's testimony that Gordon "got in a balanced

16   fighting stance and threw a punch with his left fist," *id.* at 24:17–18, is exaggerated—Gordon

17   appears to be off balance recoiling from Pacchetti's punch the moment before he swings at Dove,

18   although the video is not entirely clear.  Rollan Decl. Ex. I (Dove Video) at 0:24–0:26.  But

19   Gordon does not dispute that he swung at Dove and grazed his face.

20         Gordon attempted to flee and Pacchetti tackled him from behind, bringing him face-down

21   to the ground. *Id.* at 0:26–0:27; Gordon Decl. ¶¶ 11–12 ("[A]s a result of Defendant Pacchetti's

22   unwarranted attack, and not trying to get struck in the face again, I attempted to flee from my

23   attacker.").  Gordon kept his hands under him, resisting the officers' efforts to pull them out and

24

25   *offering* to file exhibits is not sufficient to put them in evidence.  Since the same materials were
     filed with Defendants' motion as exhibits to the declaration of Raymond Rollan, however, the
26   error is immaterial.
     [3] Pacchetti can be seen in Dove's recording throwing a punch with his left hand that appears to
27   miss Gordon.  In his incident report, Pacchetti describes punching Gordon with his right first, and
     later mentions that he injured his right hand.  Rollan Decl. Ex. A at 4.  Both officers' cameras
28   were moving and partially obscured during the struggle, and it seems likely that neither clearly
     caught the punch that struck Gordon's face.

                                              3

1    ignoring their demands to give them his hands.  Rollan Decl. Ex. I (Dove Video) at 0:27–0:39.

2    Dove gained control of Gordon's left hand and attached a handcuff, while Pacchetti dug his knee

3    into Gordon's right shoulder and pulled his right hand behind his back, eventually getting it close

4    enough for Dove to secure the second handcuff.  *Id.* at 0:39–0:57.  Gordon felt his shoulder pop

5    while Pacchetti was pulling Gordon's arm and pressing his knee into Gordon's shoulder.  Gordon

6    Decl. ¶ 13.  According to Gordon, the wrenching of his arm that led to the pop in his shoulder

7    occurred "after [he] was on the ground in a prone position on [his] stomach with both of [his]

8    hands being controlled by Defendants."  *Id.*

9         Five seconds elapsed from when Pacchetti first reached for Gordon to when Gordon was

10   on the ground, and another roughly thirty seconds before he was handcuffed.  Rollan Decl. Ex. H

11   (Pacchetti Video) at 0:22 (first reach by Pacchetti); *id.* Ex. I (Dove Video) at 0:27 (Gordon hitting

12   the ground); *id.* at 0:58 (handcuffs fastened).

13        After the officers handcuffed Gordon, they helped him up to a sitting position on the

14   sidewalk and asked if he needed an ambulance or had any complaints of pain, and Gordon

15   responded "no" to both questions.  Rollan Decl. Ex. I (Dove Video) at 1:24–2:07.  Dove asked

16   Gordon why he had tried to fight, Gordon said he had not, and Dove said Gordon hit him in the

17   face.  *Id.* at 3:05–3:22.  Dove later told Pacchetti that Gordon had "grazed [Dove] in the face."  *Id.*

18   at 3:48–3:50.

19        At the officers' direction, Gordon sat in the back seat of the patrol car around five minutes

20   after the officers first approached him.  Rollan Decl. Ex. H at 5:00–5:08.  After Gordon was in the

21   car, Dove described the incident to Pacchetti as follows:

22             . . . you went to grab him and then he pulled away from you so I went
            to grab him, and that's when he swung at you, at least I think he swung
23          at you, you hit him, and then he, as we were taking him down he
            fricking swung at me, grazed me, and that's when you tackled and
24          jumped on him.

25   Rollan Decl. Ex. I (Dove Video) at 5:37–5:58.  Pacchetti shook out his right hand as if in pain;

26   when Dove asked if it hurt, he said it did a little, but he could not really feel anything because he

27   was "pretty fired up."  *Id.* at 5:58–6:20.  Dove said he would take Pacchetti to the hospital later to

28   get it looked at.  *Id.*  The officers joked about Pacchetti making a "good tackle."  *Id.* at 6:20–6:30.

United States District Court
Northern District of California

1   They discussed whether Gordon needed an ambulance despite declining one, and in response to a

2   question by Dove, Pacchetti indicated that he had hit Gordon near his left temple.  *Id.* at 6:30–

3   6:53.

4       A few minutes later, the officers again asked whether Gordon had any complaints of pain

5   or needed medical attention, and Gordon again initially said no, but then said his right shoulder

6   did not "feel right."  *Id.* at 9:00–9:26.  Dove said that was "what happens when you're in

7   handcuffs," and Gordon said it hurt, which Dove acknowledged.  *Id.* at 9:26–9:35.  During that

8   conversation, Dove took out a key and held it to the handcuffs as if to adjust them, *id.*, but did not

9   do so, Gordon Decl. ¶ 18.  Dove then called for an ambulance to respond to Gordon's shoulder

10  pain, and Pacchetti told Gordon that Dove was doing so.  Rollan Decl. Ex. I (Dove Video) at

11  9:35–9:50; *id.* Ex. H (Pacchetti Video) at 9:35–9:50.  The officers closed the door and left Gordon

12  handcuffed.  Rollan Decl. Ex. H (Pacchetti Video) at 9:58.

13      While waiting for the ambulance, Dove asked Pacchetti if Gordon had swung at Pacchetti,

14  and Pacchetti responded that it was more like a movement he demonstrated by jerking his arms

15  upward and away as if to break a hold.  Rollan Decl. Ex. I (Dove Video) at 11:10–11:15.

16      Gordon complained about his shoulder again a few minutes later, Pacchetti told him there

17  was an ambulance coming, Gordon said he felt like it was "dislocated or something," Pacchetti

18  said again that an ambulance would come to check him out, and Gordon responded, "alright."

19  Rollan Decl. Ex. H (Pacchetti Video) at 15:16–15:32.  A little later, Gordon again said that his

20  shoulder "really hurts," and Dove responded that an ambulance was coming, and that he was sorry

21  but they could not take the handcuffs off "when you just fought us."  Rollan Decl. Ex. I (Dove

22  Video) at 17:10–17:18.

23      More police officers arrived around a minute after that, and Dove and Pacchetti told them

24  that Gordon was in the patrol car and had complained of a dislocated shoulder.  Rollan Decl. Ex.

25  H (Pacchetti Video) at 18:28–19:15.

26      A few minutes after the other officers arrived, Gordon said to Dove, "Hey please, I can't

27  feel my—my shoulder's numb."  Rollan Decl. Ex. I (Dove Video) at 21:24–29.  Dove again said

28  he could not take Gordon out of the handcuffs because he had fought them, but he would let him

5

come out of the car and sit on the curb.  *Id.* at 21:30–21:40.  Gordon repeated that his should was numb, Dove asked him to come out of the car, Gordon said he could not get up, Dove asked if he should grab the injured arm to help him, Dove helped Gordon out of the car to the curb while Gordon continued to say that his shoulder hurt, and Dove assured him that the ambulance would be there soon.  *Id.* at 21:40–22:20.  While sitting on the curb, Gordon grimaced in pain and said, "Please, I'm not going to do anything, my shoulder is numb."  Rollan Decl. Ex. H (Pacchetti Video) at 22:50–22:56.  Pacchetti said he understood but told Gordon to "hang tight."  *Id.*  Gordon continued to complain of his pain and numbness, and repeated that he was not going to do anything.  *Id.* at 22:56–23:27.  Pacchetti responded:  "Carlos, I understand you're saying that, my man, but you gotta understand where we're coming from as well, alright?  I hear you.  Just hang tight.  I understand you're in some pain, but just chill."  *Id.* at 23:27–23:37.

An ambulance arrived shortly thereafter, around twenty-three minutes after the officers detained Gordon, and less than fifteen minutes after he first complained of shoulder pain.  Rollan Decl. Ex. I (Dove Video) at 23:53.  Pacchetti told a paramedic that Gordon was a known, wanted suspect who had fought with them and was saying that his right shoulder might be dislocated.  Rollan Decl. Ex. H (Pacchetti Video) at 24:04–24:14.  Pacchetti helped Gordon to his feet and walked him to a gurney by the ambulance that was configured as an upright chair, Gordon continued to complain of pain in his shoulder, and Pacchetti told him that they could take the handcuffs off once he was in restraints in the chair.  *Id.* at 25:00–25:50.  At the suggestion of a paramedic, Pacchetti unlocked the handcuffs from Gordon's right arm and cuffed his left arm to the chair.  *Id.* at 26:10–27:05.  Gordon groaned in considerable pain throughout that process.  *Id.*  Pacchetti eventually cuffed his right arm to the chair with a second pair of handcuffs.  *Id.* at 27:38–27:47.

Pacchetti rode in the ambulance with Gordon to the hospital.  Asked by a paramedic to rate his pain on a scale of one to ten, "ten being the worst pain you ever felt in your life," Gordon described his pain level as an eight.  *Id.* at 33:50–33:57.  The ambulance reached the hospital a little over forty-five minutes after the officers first approached Gordon.  *Id.* at 46:45.  Based on an x-ray, Gordon was diagnosed with a dislocated shoulder.  Rollan Decl. Ex. K.

1  Pacchetti's police report indicated that the officers arrested Gordon for a warrant violation,

2  battery of a police officer, violation of a stay-away order, possession of methamphetamine, and

3  resisting arrest.  Rollan Decl. Ex. A at 1, 4.  Pacchetti wrote that the officers were aware of

4  Gordon's history of violence when they approached him on Market Street.  *Id.* at 4.  As compared

5  to the body camera video, he slightly exaggerated the delay in Gordon removing his hand from his

6  pocket.  *Id.*  Pacchetti wrote that after he and Dove attempted to grab Gordon's hands and

7  "Gordon immediately flailed his arms upwards," Gordon then "took a step back and took a

8  fighting stance as if he was going to become combative with us," before Pacchetti punched

9  Gordon out of "fear of Ofc. Dove and [Pacchetti's] safety, as well as the safety of the public."  *Id.*

10  At his deposition, Pacchetti testified that Gordon only took a "fighting stance" (as described by

11  Gordon's counsel and illustrated by a picture of a person in such a stance) *after* Pacchetti punched

12  him, although he also testified that Gordon had his hands near his chest in a position from which

13  he could have struck the officers before Pacchetti punched him.  Goff Decl. (dkt. 58-1) Ex. C

14  (Pacchetti Dep.) at 15:3–16:12.  Gordon states in his declaration that he was not in a fighting

15  stance before Pacchetti punched him.  Gordon Decl. ¶ 21.  Pacchetti also wrote in his report that

16  he punched the right side of Gordon's face, Rollan Decl. Ex. A at 4, but testified that was a

17  mistake and he actually punched the left side of Gordon's face, Goff Decl. Ex. C (Pacchetti Dep.)

18  at 16:14–17.  Pacchetti omitted the fact that he dug his knee into Gordon's shoulder, noting

19  instead that he used his knee to restrain Gordon's elbow to allow Dove to secure the handcuffs.

20  Rollan Decl. Ex. A at 4.

21  Gordon was charged with threatening Dove and Pacchetti in violation of California Penal

22  Code section 69(a), and battery on Dove in violation of section 243(b).  Rollan Decl. Ex. L.  He

23  was incarcerated for approximately seven months pending trial.  Gordon Decl. ¶ 23.  He

24  was acquitted of all charges at trial, except for a lesser included charge of resisting arrest under section

25  148(a)(1), which was dismissed after the jury was unable to reach a unanimous verdict.  *Id.*

26  **B.    Claims Asserted**

27  Gordon asserts three claims under § 1983: that Defendants violated his rights under the

28  Fourth Amendment by using excessive force, 3d Am. Compl. (dkt. 47) ¶¶ 30–35; that Defendants

violated his rights under the Fourteenth Amendment by deliberately fabricating evidence, *id.* ¶¶ 36–42; and that Defendants violated his rights under the Fourth and Fourteenth Amendments by continuing to detain him with his hands cuffed behind his back despite Gordon notifying them that it caused him shoulder pain, *id.* ¶¶ 43–48.[4]

### C.   The Parties' Arguments

Defendants argue that the City should be dismissed as a party because Gordon's complaint does not allege a claim for entity liability under the standard of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which permits § 1983 claims against government entities rather than individual officers only in relatively narrow circumstances, like when an officer acts pursuant to an official policy or due to constitutionally inadequate training.  Mot. (dkt. 50) at 17–18. Gordon does not respond to this argument in his opposition brief.

Defendants argue that they are entitled to summary judgment on Gordon's excessive force claim because the officers' use of "personal body weapon[s]"—i.e., punching Gordon, tackling him, and restraining him with a knee to his shoulder on the ground—was reasonable in light of Gordon resisting arrest and the officers' knowledge of his violent history.  *Id.* at 18–24.  To the extent Gordon's claims are based on the officers' failure to loosen his handcuffs after he complained of shoulder pain, Defendants argue that the officers' call for an ambulance satisfied their obligation to provide medical care, and that this case is distinguishable from others where detainees specifically asked officers to loosen their handcuffs.  *Id.* at 24–25.

Gordon contends that Pacchetti punching his head and wrenching his shoulder was a serious use of force not justified by Gordon's limited resistance or the failure-to-appear warrant for which he was wanted.  Opp'n (dkt. 58) at 5–6.[5]  He argues that Dove is liable as an integral

---

[4] Because Gordon captioned this third claim "unlawful detention," Defendants address in their briefing the probable cause to detain Gordon on multiple charges.  Mot. at 30–34.  Gordon does not dispute in either his complaint or his opposition brief that Defendants had probable cause to arrest him.  Despite the less-than-clear caption of his third claim, Gordon's allegations and arguments indicate that he is challenging only the manner in which he was detained, and the Court therefore addresses that theory without further discussion of probable cause.  If Gordon's complaint could be construed as asserting a claim that Defendants lacked probable cause to arrest him, however, Defendants would be entitled to summary judgment on that theory, based at the very least on the outstanding bench warrant for Gordon's arrest.  *See* RJN Ex. A.

[5] Gordon's opposition brief does not include page numbers.  This order cites that brief using the

United States District Court
Northern District of California

1    participant in the arrest, *id.* at 7–8, and that the manner of his detention, keeping him in handcuffs

2    without any adjustment in response to his complaints of pain, was unreasonable, *id.* at 8.

3        Turning to Gordon's claim for fabrication of evidence, Defendants argue that the

4    discrepancy on which Gordon relies—the question of when Gordon entered a "fighting stance"—

5    is "a matter of semantics" because Pacchetti testified at his deposition that Gordon had his hands

6    near his chest in a position that would have allowed him to deliver a punch, and "ultimately,

7    immaterial" because Gordon flailing his arms upward away from Pacchetti's grasp was itself

8    sufficient grounds for Pacchetti to punch him in the face even if he had not been in a fighting

9    stance.  Mot. at 26–28.  Defendants also argue that any omission of evidence from the police

10   report by Dove cannot support a deliberate fabrication claim, *id.* at 28–29, and that the purported

11   fabrication by Pacchetti did not cause Gordon harm because the timing of Gordon entering a

12   fighting stance was not material to the charges filed against him, *id.* at 29–30.  Gordon contends

13   that Pacchetti's deposition testimony directly contradicted his report as to the timing of Gordon's

14   fighting stance, and that "[t]his false statement was material because it portrayed the Plaintiff as

15   being the aggressor, which provided probable cause for the Plaintiff to be charged and prosecuted

16   with battery on a police officer," citing no evidence or authority for the latter point.  Opp'n at 9.

17       For his arguments regarding excessive force and falsified evidence, Gordon relies in part

18   on a report by Roger Clark, a former law enforcement officer who has testified as an expert in use

19   of force in a number of cases.  *See* Opp'n at 3–4; Clark Decl. (dkt 58-3).  Defendants object to the

20   admissibility of Clark's report in their reply.  Reply (dkt. 60) at 2–3.

21       Defendants also argue that the officers are entitled to qualified immunity.  Mot. at 34–38.

22   Gordon argues that qualified immunity is not available because the following principles are clearly

23   established by Supreme Court and Ninth Circuit precedent: (1) "an officer cannot use significant

24   force on a non-threatening suspect who does not pose an imminent threat, has not committed a

25   severe crime and is not actively resisting"; (2) "police officers cannot detain someone in a manner

26   that causes unnecessary pain, and indignity"; (3) multiple police officers can be held liable based

27

28
_____

page numbers assigned by the Court's ECF filing system.

United States District Court
Northern District of California

1    on an "integral participant" theory; and (4) "an officer who fabricates evidence in a police report

2    can be held liable."  Opp'n at 10.  He contends that those principles, combined with "the

3    obviousness of [his] rights being violated" in this case, preclude qualified immunity.  *Id.*

4    Defendants respond that Gordon has not met his burden to show clearly established law "'in light

5    of the specific context of the case, not as a broad general proposition.'"  Reply at 13 (quoting

6    *Rivas-Villegas v. Cortesluna*, 595 U.S. __, No. 20-1539, 2021 WL 4822662, at *2 (Oct. 18, 2021)

7    (per curiam)).

8        The Court notes that Defendants' motion exceeds the twenty-five page limit set by Civil

9    Local Rule 7-2(b), even setting aside pages devoted to the table of contents and table of

10   authorities.  The excessive pages were not necessary in this case, and regardless, counsel did not

11   seek or obtain permission to exceed the limit.  Defense counsel is admonished to comply with

12   applicable page limits in any future cases before this Court.

13   **III.    ANALYSIS**

14       **A.    Legal Standard**

15       Summary judgment on a claim or defense is appropriate "if the movant shows that there is

16   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

17   law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

18   the absence of a genuine issue of material fact with respect to an essential element of the non-

19   moving party's claim, or to a defense on which the non-moving party will bear the burden of

20   persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

21       Once the movant has made this showing, the burden then shifts to the party opposing

22   summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.*

23   (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

24   disputed must support the assertion by . . . citing to particular parts of materials in the record

25   . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

26   substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v.*

27   *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

28   identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan*

United States District Court
Northern District of California

1    *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the

2    record in search of a genuine issue of triable fact.'"  *Id.* (citation omitted); *see Carmen v. S.F.*

3    *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

4         A party need not present evidence to support or oppose a motion for summary judgment in

5    a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

6    to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.

7    2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

8    are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

9    *Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

10   reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

11   (2007), but where a rational trier of fact could not find for the non-moving party based on the

12   record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

13   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

14        **B.    The City Is Entitled to Summary Judgment on All Claims Against It**

15        Under *Monell*, a municipality cannot be held liable under § 1983 for constitutional injuries

16   inflicted by its employees on a theory of respondeat superior.  *Monell*, 436 U.S. at 691.  "Instead,

17   it is when execution of a government's policy or custom, whether made by its lawmakers or by

18   those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the

19   government as an entity is responsible under § 1983." *Id.* at 694.  A plaintiff seeking to establish

20   municipal liability under § 1983 may do so in one of three ways: (1) the plaintiff may demonstrate

21   that a municipal employee committed the alleged constitutional violation "pursuant to a formal

22   government policy or longstanding practice or custom which constitutes the standard operating

23   procedures of the local governmental entity"; (2) the plaintiff may demonstrate that the individual

24   who committed the constitutional violation was an official with "final policy-making authority and

25   that the challenged action itself thus constituted an act of official government policy"; or (3) the

26   plaintiff may demonstrate that "an official with final policy-making authority ratified a

27   subordinate's unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979

28   F.2d 1342, 1346 (9th Cir. 1992).

United States District Court
Northern District of California

11

1    Despite Defendants raising this issue in their motion, Gordon does not address the *Monell*

2    standard or his claims against the City in his opposition brief.  He has identified no evidence that

3    the conduct at issue was in accordance with an official policy or any of the other methods of

4    establishing entity liability under *Monell*.  Defendants' motion is GRANTED as to Gordon's

5    claims against the City.

6    **C.   Clark's Report Is Inadmissible**

7    Gordon relies in part on the expert opinions of Roger Clark, which Defendants contend are

8    inadmissible.

9    Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness

10   who is qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R.

11   Evid. 702.  This Rule embodies a "relaxation of the usual requirement of firsthand knowledge,"

12   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993), and requires that certain criteria

13   be met before expert testimony is admissible.  Rule 702 sets forth four elements, allowing such

14   testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

21   Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability

22   and relevance."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.2011).

23   Here, Clark's report is unreliable because it is not "based on sufficient facts or data," or,

24   put differently, it is irrelevant because it does not accurately address the facts of this case.

25   Portions of the report simply misstate the facts, perhaps addressing aspects of a different case.

26   *See, e.g.*, Clark Decl. at 13 (describing "excessive force exhibited by Officer Pacchetti, when he

27   immediately used his baton against Mr. Gordon," and faulting an "Officer Hernandez" in addition

28   to Dove for failing to intervene in Pacchetti's purported use of a baton).

1          Perhaps most significantly, Clark accepts for the purpose of his opinion on excessive force

2   that Gordon "simply turned and asked, 'why?' and gave himself up for detainment, [and that] he

3   had complied with orders and was at most, at that point of his apprehension . . . passive/reactive

4   non-compliant." Clark Decl. at 10.  Clark does not account for Gordon pulling his arms away

5   from Pacchetti's grasp, which Gordon admits to doing and is clear from the video footage, and

6   which—based on the San Francisco Police Department training framework that Clark cites as

7   relevant to reasonableness—would constitute "[a]ctive resistance" in that it consisted of

8   "[p]hysically evasive movements to defeat an officer's attempt at control," thus potentially

9   justifying "[u]se of personal weapons . . . to gain an advantage over the suspect." *See id.* at 9.

10   Clark also makes no mention of the officers' briefing and experience regarding Gordon's history

11   of violence, including violently resisting arrest and a conviction for manslaughter, which would

12   undoubtedly inform a reasonable officer's assessment of the situation as a whole.  *See County of*

13   *Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) ("Excessive force claims are evaluated

14   for objective reasonableness based upon the information the officers had when the conduct

15   occurred." (cleaned up)).

16          Later, when addressing Pacchetti's falsification of his report, Clark takes as true "Mr.

17   Gordon's set of facts . . . that he only pulled his hands into his body and asked why he was being

18   arrested," and thus faults Pacchetti for falsely stating "that Mr. Gordon was non-compliant and

19   attempted to flee." *Id.* at 12.  Clark does not explain how Gordon pulling away from Pacchetti's

20   grasp as he was informed he was under arrest was not itself non-compliant, and ignores Gordon's

21   admission that he "attempted to flee" after Pacchetti punched him, Gordon Decl. ¶ 11, which is

22   consistent with Pacchetti's report of when Gordon attempted to flee, Rollan Decl. Ex. A at 4.

23   Clark does not address the only falsification theory raised in Gordon's opposition brief, pertaining

24   to the timing of Gordon entering a fighting stance.

25          Since Clark bases his opinions on a plainly inaccurate and incomplete version of the facts

26   at hand, even when the record is viewed in the light most favorable to Gordon, his opinions on the

27   officers' conduct in the counterfactual circumstances he describes would not assist a jury in

28   assessing the reasonableness of Dove and Pacchetti's actual conduct here.  The Court therefore

United States District Court
Northern District of California

13

1    declines to consider Clark's opinions, without reaching Defendants' arguments that they are also

2    inadmissible for expressing conclusions of law, usurping the role of the jury, or addressing

3    medical issues outside of his expertise.

4           In any event, even if Clark's opinions were admissible, they do not alter the Court's

5    conclusion that Dove and Pacchetti are entitled to qualified immunity for lack of clear precedent

6    establishing their conduct to be constitutionally unreasonable, or that Gordon has failed to show

7    that the purported false statement of when he entered a fighting stance was material to his

8    deprivation of liberty, as discussed below.

9           **D.    Excessive Force**

10              A Fourth Amendment claim of excessive force is analyzed under the
                framework set forth by the Supreme Court in *Graham v. Connor*, 490
11              U.S. 386 (1989). That analysis requires balancing the "nature and
                quality of the intrusion" on a person's liberty with the "countervailing
12              governmental interests at stake" to determine whether the use of force
                was objectively reasonable under the circumstances. *Id.* at 396.
13              Determining whether a police officer's use of force was reasonable or
                excessive therefore "requires careful attention to the facts and
14              circumstances of each particular case" and a "careful balancing" of
                an individual's liberty with the government's interest in the
15              application of force. *Id.*; *see Deorle v. Rutherford*, 272 F.3d 1272,
                1279–81 (9th Cir. 2001). Because such balancing nearly always
16              requires a jury to sift through disputed factual contentions, and to
                draw inferences therefrom, we have held on many occasions that
17              summary judgment or judgment as a matter of law in excessive force
                cases should be granted sparingly. *See, e.g.*, *Liston v. County of*
18              *Riverside*, 120 F.3d 965, 976 n. 10 [(9th Cir. 1997)] (citing several
                cases).

19

20   *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  Relevant considerations "include 'the

21   relationship between the need for the use of force and the amount of force used; the extent of the

22   plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the

23   severity of the security problem at issue; the threat reasonably perceived by the officer; and

24   whether the plaintiff was actively resisting.'"  *Lombardo v. City of St. Louis*, 141 S. Ct. 2239,

25   2241 (2021) (per curiam) (quoting *Kingsley v. Hendrickson*, 576 U. S. 389, 397 (2015)).

26          The doctrine of qualified immunity protects government officials performing discretionary

27   functions "from liability for civil damages insofar as their conduct does not violate clearly

28   established statutory or constitutional rights of which a reasonable person would have known."

United States District Court
Northern District of California

1    *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The salient question is whether the state of the

2    law at the time of an incident provided fair warning to the defendants that their alleged conduct

3    was unconstitutional."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up).  The qualified

4    immunity inquiry does not alter the general rule on summary judgment that factual disputes and

5    reasonable inferences must be resolved in favor of the non-moving party.  *See id.* at 657–60.  The

6    same fact-specific distinctions that make excessive force cases difficult to resolve on their merits

7    on summary judgment also raise a significant hurdle for plaintiffs seeking to overcome qualified

8    immunity:  "Specificity is especially important in the Fourth Amendment context, where it is

9    sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive

10   force, will apply to the factual situation the officer confronts."  *Rivas-Villegas*, 595 U.S. at __,

11   2021 WL 4822662, at *2 (cleaned up).

12        The officers' encounter with Gordon began with Pacchetti reaching to grab Gordon's hand

13   and effectuate an arrest.  Gordon does not contend that Pacchetti lacked probable cause to do so or

14   that attempting to grab his hand was itself an unconstitutional use of force.

15        The first use of force to which Gordon objects is Pacchetti punching him in the face.  At

16   that point, Pacchetti had informed Gordon he was under arrest, and Gordon had nevertheless

17   jerked his hands away from Pacchetti, raised them towards his chest, and tried to struggle away

18   from him.  Rollan Decl. Ex. H (Pacchetti Video) at 0:22–0:25; *id.* Ex. I (Dove Video) at 0:22–

19   0:25.  Pacchetti had also been briefed on Gordon's history of violently resisting arrest.  *See*

20   *Mendez*, 137 S. Ct. at 1546–47 (noting that reasonableness is evaluated "based upon the

21   information the officers had").

22        No reasonable jury could find Pacchetti's decision to punch Gordon when he resisted arrest

23   was unreasonable under the Fourth Amendment.  A punch to the head is generally treated as

24   "intermediate force that, while less severe than deadly force, nonetheless presents a significant

25   intrusion upon an individual's liberty interests."  *Russell v. City & Cty. of San Francisco*, No. C-

26   12-00929-JCS, 2013 WL 2447865, at *10 (N.D. Cal. June 5, 2013) (quoting *Coles v. Eagle*, 704

27   F.3d 624, 628 (9th Cir. 2012)) (cleaned up).  That said, "[n]either tackling nor punching a suspect

28   to make an arrest necessarily constitutes excessive force."  *Blankenhorn v. City of Orange*, 485

United States District Court
Northern District of California

F.3d 463, 477 (9th Cir. 2007).  Courts have approved of even painful and injurious techniques used to effectuate arrests.  In *Forrester v. City of San Diego*, for example, the Ninth Circuit held that "ample evidence support[ed] the jury's conclusion that the [defendant] officers acted reasonably in using pain compliance techniques," specifically, tightening nunchaku (also known as nunchucks) around the wrists of peaceful protestors to coerce them to stand up and vacate the doors of medical clinics they had been blocking, in one instance breaking a protestor's wrist.  25 F.3d 804, 806–07 (9th Cir. 1994).  Granted, unlike here, the officers warned the protestors before taking that action, but also unlike here, the protestors were not actively resisting arrest and the officers were not aware of them having a history of violence.  The "most important" factor in assessing an officer's legitimate interest in use of force "is whether the individual posed an immediate threat to officer or public safety."  *Young v. County of Los Angeles*, 655 F.3d 1156, 1163.  It is undisputed that Pacchetti was aware of Gordon's history of violence, and the officers' body camera videos show Gordon acting confrontationally while actively resisting their efforts to restrain his hands.  Under those circumstances, Pacchetti's interest in hitting Gordon before Gordon could hit him first is obvious.[6]

It is certainly possible that a less confrontational approach might have been effective. Gordon had complied with Pacchetti's instruction to remove his hand from his pocket after Pacchetti repeated it; perhaps he would have also complied if Gordon had instructed him specifically to surrender his hands for cuffing or answered his question as to why he was being arrested.  "But, as the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

In any event, Pacchetti is entitled to qualified immunity for the punch.  Gordon cites no precedent that would have put Pacchetti on notice that punching Gordon under these

---

[6] Gordon's assertion in his opposition brief that "there was no active resistance," Opp'n at 6, is belied by the video footage, and by Gordon's own declaration that he pulled his arms away as the officers attempted to grab them and informed him he was under arrest, Gordon Decl. ¶¶ 5–8.  The summary judgment standard does not required a court to credit statements in a declaration—much less assertions in a brief—that are plainly contradicted by video evidence. *See Scott*, 550 U.S. at 380–81.

United States District Court
Northern District of California

1    circumstances violated the Fourth Amendment.  Responding to Defendants' argument for

2    qualified immunity, Gordon cites only *Scott*, 550 U.S. at 381–83, and *Graham*, 490 U.S. at 395,

3    for the proposition "that an officer cannot use significant force on a non-threatening suspect who

4    does not pose an imminent threat, has not committed a severe crime and is not actively resisting."

5    Opp'n at 10.

6         For one thing, even viewing the record in the light most favorable to Gordon, he *was*

7    actively resisting at the time Pacchetti punched him, and Pacchetti had at least some reason to fear

8    Gordon was an imminent threat if not quickly restrained.  Moreover, the cases he cites do not

9    show that a punch under these circumstances would violate the Fourth Amendment.  *Scott*

10   addressed the use of *deadly* force in a car chase, not the intermediate force of a punch, and held

11   that the defendant officer was entitled to summary judgment that his use of deadly force was

12   reasonable.  550 U.S. at 381–83.  *Graham* also addressed the use of deadly force, and set forth the

13   basic balancing test of the nature of the intrusion and the countervailing governmental interests.

14   490 U.S. at 395–97.  The Supreme Court has cautioned repeatedly that *Graham* and similar cases

15   "cast 'at a high level of generality'" do not provide the sort of notice necessary to overcome

16   qualified immunity except in "'an obvious case.'"  *E.g.*, *Rivas-Villegas*, 595 U.S. at __, 2021 WL

17   4822662, at *3 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).  This

18   case—where Gordon had a known history of violently resisting arrest and was actively resisting

19   the officers' efforts to restrain his arms—is not obvious, and Gordon has not identified more

20   specific precedent that would make clear to a reasonable officer in Pacchetti's position that he

21   could not punch Gordon under those circumstances to obtain compliance.

22        Next, tackling Gordon was not excessive, and again, the officers are entitled to qualified

23   immunity for this conduct even if there were any doubt as to its reasonableness.  Pacchetti tackled

24   Gordon when, by Gordon's own admission, he attempted to flee.  Nor does Gordon contest that he

25   had thrown a punch that grazed Dove's face before Gordon was tackled.  Gordon does not suggest

26   that tackling a fleeing suspect who has somewhat successfully attempted to strike an officer is in

27   itself excessive force, and cites no authority that would put an officer on notice that tackling

28   Gordon under the circumstances of this case violated the Fourth Amendment.

1    After the tackle, the officers struggled to handcuff Gordon while he was on the ground.

2    There is no dispute that Pacchetti pressed his knee into Gordon's back while pulling Gordon's arm

3    back towards the handcuffs.  It seems likely that dislocated Gordon's shoulder.

4    Gordon states that Pacchetti only lodged his knee into Gordon's back and pulled on his

5    arm "after [Gordon] was on the ground in a prone position on [his] stomach with both of [his]

6    hands being controlled by" the officers.  Gordon Decl. ¶ 13.  Dove's video recording, however,

7    shows that after being tackled, Gordon initially kept his hands under his body and vigorously

8    resisted the officers' attempts to pull them behind his back.  Rollan Decl. Ex. I (Dove Video) at

9    0:27–0:57.  Viewing the video in the light most favorable to Gordon, he may have stopped

10   resisting around ten seconds before the officers secured the handcuffs.  But up until that point, he

11   had actively resisted the officers' attempts to grab his hands when they first approach, struck Dove

12   in the face, attempted to flee, and attempted to keep his hands under his body despite commands to

13   surrender them after Pacchetti tackled him.  Pacchetti's decision to restrain Gordon with his knee

14   while trying to secure the handcuffs was reasonable, even if it caused a significant injury.

15   Moreover, defendants are entitled to qualified immunity for the manner of handcuffing

16   Gordon.  Gordon has identified no precedent clearly indicating that Pacchetti's conduct in

17   handcuffing Gordon violated the Fourth Amendment.  While Gordon cites no case remotely

18   analogous, decisions by the Ninth Circuit and the Supreme Court that he does not cite have

19   addressed somewhat similar circumstances.

20   In *LaLonde v. County of Riverside*, officers responded to a complaint of a disturbance by

21   the plaintiff's neighbor, and spoke to the plaintiff at the door of his apartment.  204 F.3d 947, 951

22   (9th Cir. 2000).  The neighbor had reported that the plaintiff owned a rifle, "had a hostile attitude

23   toward law enforcement[,] and that the officers should be careful because he might be willing to

24   use the rifle."  *Id.*  Viewing the facts in the light most favorable to the plaintiff, he declined to step

25   out of his apartment and told the officers that the complaint was "bullshit" and part of an ongoing

26   effort by his neighbor to harass him, when one of the officers reached through the door and

27   grabbed his shirt.  *Id.*  The plaintiff declined to submit to an arrest for obstructing an investigation.

28   *Id.* at 951–52.  The officer grabbed him by his hair, knocked him to the floor, and straddled him to

United States District Court
Northern District of California

18

attempt to handcuff him.  *Id.* at 952.  The plaintiff "resisted and the two men got into a scuffle."
*Id.*  The officer pepper sprayed the plaintiff and his "resistance ceased."  *Id.*  A second officer then
entered the room to assist in handcuffing the plaintiff, and "forcefully put his knee into [the
plaintiff's] back, causing him significant pain."  *Id.*  Among other potential constitutional
violations in the case, Ninth Circuit held that "if the extent of the injury to [the plaintiff's] back is
serious enough, a jury could conclude that [the officer] used force in excess of what was
reasonable, even if [the plaintiff] had been resisting at the time."  *Id.* at 959.  In a footnote, the
court made clear that applying a summary judgment standard, the plaintiff had ceased resisting by
the time the officer dug his knee into his back, causing "long-term if not permanent back injury."
*Id.* at 959 n.17.

  In *Rivas-Villegas*, the Supreme Court recently considered another case from the Ninth
Circuit that involved an officer's knee on a plaintiff's back.  The Court held that *LaLonde* was not
sufficiently similar to overcome qualified immunity, based on the following distinctions:

> The situation in *LaLonde* and the situation at issue here diverge in
> several respects. In *LaLonde*, officers were responding to a mere noise
> complaint, whereas here they were responding to a serious alleged
> incident of domestic violence possibly involving a chainsaw. In
> addition, LaLonde was unarmed. Cortesluna, in contrast, had a knife
> protruding from his left pocket for which he had just previously
> appeared to reach. Further, in this case, video evidence shows, and
> Cortesluna does not dispute, that Rivas-Villegas placed his knee on
> Cortesluna for no more than eight seconds and only on the side of his
> back near the knife that officers were in the process of retrieving.
> LaLonde, in contrast, testified that the officer deliberately dug his
> knee into his back when he had no weapon and had made no threat
> when approached by police. These facts, considered together in the
> context of this particular arrest, materially distinguish this case from
> *LaLonde*.

*Rivas-Villegas*, 2021 WL 4822662, at *3.

  Neither case is perfectly analogous to the facts here.  Unlike *Rivas-Villegas*, the officers in
this case were not responding to a serious crime, and Gordon was not armed.  But unlike *LaLonde*,
Gordon had struck an officer in the face and attempted to flee before Pacchetti used his knee to
restrain him.  Gordon was also actively resisting while Pacchetti was attempting to handcuff him
on the ground.  Even if he ceased resisting several seconds before the officers succeeded in
handcuffing him, that is distinct from *LaLonde*, where—viewing the facts in the light most

1    favorable to the plaintiff—the officer who used his knee only got involved at all after the plaintiff

2    had ceased resisting as a result of pepper spray.  Finally, the officers in this case had been briefed

3    on Gordon's history of violence, including violently resisting arrest, establishing stronger

4    foundation that he posed a potential threat than the neighbor in *LaLonde*'s unsubstantiated and

5    speculative report that the plaintiff "had a hostile attitude toward law enforcement and . . . might

6    be willing to use [his] rifle."  *See* 204 F.3d at 951.

7          If Defendants were required to show that precedent clearly established Pacchetti's conduct

8    was lawful, *Rivas-Villegas* would not be sufficient to do so.  But that is not the standard.  To

9    overcome qualified immunity, Gordon must show that precedent clearly showed that the conduct

10   at issue violated the Fourth Amendment.  In considering that question in a Fourth Amendment

11   case, "specificity is especially important" to address "how the relevant legal doctrine, here

12   excessive force, will apply to the factual situation the officer confronts."  *Mullenix v. Luna*, 577

13   U.S. 7, 12 (2015) (citation omitted).  Having cited no case at all similar, Gordon has plainly not

14   met "burden of proving that the rights he claims were 'clearly established' at the time of the

15   alleged violation," with "contours . . . sufficiently clear that a reasonable official would understand

16   that what he is doing violates that right."  *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009)

17   (cleaned up).  Even taking account *LaLonde*, which Gordon did not cite, the factual distinctions

18   between that case and this one are sufficient that under the reasoning of *Rivas-Villegas*, it does not

19   provide sufficient notice that Pacchetti's conduct handcuffing Gordon was unconstitutional.[7]

20         Finally, Gordon contends that the officers should be held liable for failing to remove his

21   handcuffs, extend them with an extra pair of handcuffs, or cuff his hands in front of him rather

22   than behind him when he alerted them to his shoulder pain.  Mot. at 8.  This conduct did not

23   violate the Fourth Amendment, and, in any event, the officers are entitled to qualified immunity

24   for the claims based on the failure to remove or adjust the handcuffs.  The only case Gordon cites

25

26   _____

27   [7] For the same reasons Pacchetti is entitled to summary judgment for claims based on his conduct
     punching, tackling, and handcuffing Gordon, Dove is also entitled to summary judgment on
     Gordon's theory that he is liable as an integral participant in that conduct.  The Court does not
28   reach the question of whether Dove's involvement would be sufficient to support such a claim if
     Gordon could proceed on his claims against Pacchetti.

1   for this theory is *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994), which held that officers

2   violated Fourth Amendment rights of a plaintiff (Johnny Curry) during a search where he was not

3   a suspect under the following "unusual" circumstances:

> They executed the warrant in an unreasonable manner, first by
> removing a gravely ill and semi-naked man from his sickbed without
> providing any clothing or covering, and then by forcing him to remain
> sitting handcuffed in his living room for two hours rather than
> returning him to his bed within a reasonable time after the search of
> his room was completed. None of the officers had any reason to
> believe, on the basis of the information they had prior to the search or
> their observations once in the house, that Curry had committed a
> crime, or that he was armed. In fact, the officers were not even aware
> that Curry lived in the house prior to executing the warrant. It should
> also have been clear to them that Curry was not a gang member.
> Finally, it should have been obvious to the officers that Curry
> presented little risk of danger to them, that he presented absolutely no
> risk of flight, and that it was highly unlikely that he could interfere
> with their search in any way.

12   31 F.3d at 876–77.

13       This case does not resemble *Franklin* in any meaningful way. Most notably, the officers

14   had reason to believe Gordon presented a risk of danger and flight, as he had already fought with

15   them and attempted to flee. They also had probable cause to arrest him for multiple crimes, unlike

16   the plaintiff in *Franklin*, who was merely a bystander to a search. *Franklin* would not put a

17   reasonable officer on notice that they were obligated to remove or adjust Gordon's handcuffs after

18   he had fought with them, during the roughly fifteen-minute period they waited for an ambulance

19   after he first reported pain. And while the Ninth Circuit has addressed claims based on handcuffs

20   attached too tightly around a plaintiff's wrists—in cases that Gordon does not cite in his brief—

21   those cases tend to involve officers applying handcuffs too tightly in the first place, and the issue

22   could have been remedied by the officers simply loosening the cuffs around the detainees' wrists,

23   rather than removing them entirely to reapply them in a different configuration. *See, e.g.*,

24   *LaLonde*, 204 F.3d at 960 (citing *Palmer v. Sanderson*, 9 F.3d 1433 (9th Cir. 1993); *Hansen v.*

25   *Black*, 885 F.2d 642 (9th Cir. 1989)). Gordon identifies no case clearly establishing that the

26   officers' decision to leave him handcuffed while they waited for an ambulance violated his

27   constitutional rights.

28       To the contrary, the Ninth Circuit has held that "a police officer who promptly summons

the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment," even where officers failed to perform CPR that could have saved the life of detainee whose medical condition was deteriorating after he resisted arrest and was placed in handcuffs. *Tatum v. City & Cty. of San Francisco,* 441 F.3d 1090, 1098 (9th Cir. 2006). Here, the officers repeatedly asked Gordon whether he was injured, summoned an ambulance as soon as he reported any pain, repeatedly reassured him that help was on the way, helped him out of the patrol car to sit on the curb to provide some relief, and kept him in handcuffs for only around fifteen minutes after he first reported pain. Taking into account the potential risks of removing Gordon's handcuffs after he had fought with them, no reasonable jury could find that the officers failed to meet their obligations under *Tatum*. Even if the contrary conclusion could be reached based on these facts, the officers are entitled to qualified immunity on this claim.

None of Dove or Pacchetti's conduct during Gordon's arrest and detention violated the Constitution. Even if a jury could disagree, Gordon has not identified authority that would put a reasonable officer on notice that any aspect of that conduct was unconstitutional under the circumstances of the case. Defendants are therefore entitled to summary judgment on Gordon's first and third claims for relief.

### E. Falsification of Evidence

The Ninth Circuit has recognized "a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2018). To prevail on such a claim, "a plaintiff must prove that (1) the defendant official deliberately fabricated evidence, and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 793, 798 (9th Cir. 2017).

Gordon's claim fails on the element of causation, even if the Court assumes for the sake of argument that Pacchetti deliberately fabricated his report that Gordon took a fighting stance before Pacchetti punched him, which is the only purported fabrication that Gordon addresses in his opposition brief. *See* Opp'n at 9. Gordon was charged under Penal Code section 69(a), which provides for imprisonment up to one year of any "person who attempts, by means of any threat or

United States District Court
Northern District of California

22

United States District Court
Northern District of California

violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty," and under section 243(b), which provides for imprisonment up to one year for battery of police officer.  Rollan Decl. Ex. L; Cal. Penal Code §§ 69(a), 243(b).  Gordon does not refute Dove's testimony that Gordon swung at him and grazed his face.  The undisputed evidence demonstrates that Gordon resisted the officers' attempt to arrest him.  He offers no evidence or authority to indicate that the timing of when he took a fighting stance towards Pacchetti was material to the decision to charge him for assaulting Dove and resisting both officers, or to detain him pending trial.  *See Cox v. United States*, No. 8:16-CV-01222-CJC (KES), 2019 WL 297982, at *15 (C.D. Cal. Jan. 22, 2019) (granting a motion to dismiss where "Defendants' alleged fabrication of evidence did not cause Plaintiff to confront any criminal charges that he would not have otherwise confronted"), *recommendation adopted*, 2019 WL 295762 (C.D. Cal. Jan. 23, 2019).  Gordon thus has not met his burden to show causation, and Defendants are entitled to summary judgment on his claim for falsification of evidence.

## IV.	CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is GRANTED as to all of Plaintiff Carlos Gordon's claims.  The Clerk shall enter judgment in Defendants' favor and close the case.

**IT IS SO ORDERED.**

Dated: November 22, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

23